This case received double the last case, for example, which is a disproportionate allocation. So I think you both would be able to present your arguments. It's not that complicated. It may be important, but it's not that complicated. And so if you could make an attempt to see if you could hold us somewhere between 10 and 15 rather than 20. Your Honor, we have no problem with that, or at least I don't. I don't think that I'll refer to all of the amendments allocated. I'm sure if you don't, you're opposing counsel all year. All right. Your Honor, good morning. My name is Christopher Blattner, and I represent the petitioner in this matter, whom I'll refer to throughout my argument in this Fairview. Could you speak up a bit? Certainly. My name is Christopher Blattner, and I represent the petitioner in this matter. I'll refer to the petitioner plaintiff as Fairview Village. I'm asking to reserve five minutes for rebuttal of my allocated time. As the briefing shows, this is a civil dispute. It arises out of a real estate purchase agreement. In fact, a series of them relating to some commercial development out in East County known as Fairview Village. My clients were the developers. Mr. Overstreet, who is the principal of Amber Hill Properties, was also a sophisticated investor, an attorney, and had five years' experience dealing in this particular development and was one of many investors who were involved in funding that development. As a result of the trial, what happened was the court ruled in favor of Mr. Overstreet and ordered specific performance under this contract requiring Fairview Village to exercise its purchase obligation under the real estate purchase agreement and restructuring agreement that accompanied that agreement. And further, when Fairview Village was unable to complete that purchase, required equitable subordination of Fairview Village's interests to the interests of Amber Hill. So as it now stands under this court's judgment, Mr. Overstreet has been pushed to the front of the line and preexisting interests belonging to other investment groups affiliated with Fairview Village have been made junior to that interest. We believe that the district court erred in a number of critical respects in ordering that particular relief, and I'd like to focus on those, what we consider the most central issues, although we believe all of the issues raised in the blue brief are meritorious and well taken. The primary issue that we think this court should focus on is whether or not specific performance and the award of specific performance was appropriate utilizing the court's equitable powers in a situation where you had a wholly executory, fully documented real estate agreement between two sophisticated commercial parties. In that agreement, in fact, in multiple instances of that agreement, there were expressed time is of the essence clauses, and it was Mr. Overstreet who had initiated the exchange between the parties, indicating that the June 30, 2000 date was a must-close situation. He wasn't going to accept extensions or delay in essentially requiring Fairview Village to repurchase his interest in that property. If I understand correctly, the district judge said that Overstreet reasonably relied on the stuff that the lawyer in Haw, is that his name, Messerly and Haw? Yes. Fairview Village was represented by Ron Messerly, and then Charlie Haw was the president of Fairview Village. Right. The district judge said that Overstreet justifiably relied on this stuff, and that he did so. And how do we find that? Either those factual findings are wrong or the conclusion is abusive, given the equitable nature of the relief. Your Honor, we believe those findings go directly to the issues of waiver and or estoppel that were raised as affirmative defenses to the initial claim brought by Fairview Village. Now, certainly the standard for review on factual findings, and we believe the actions that the court ultimately found in the findings of fact, would be judged by a clearly erroneous standard. But if the court looks at the record, the statement of Messerly, the attorney, and I believe the court corrects trial counsel for Mr. Overstreet on this, never said that he had the authority. In fact, he expressly stated he didn't have the authority to extend the closing date. He initially responded to Mr. Overstreet's question of could closing be delayed until the following week. He referred him to Haw, right? Yes. He said, I don't have authority. I don't think it's a problem, but you need to talk to Charlie. And Haw said something along the lines of it won't be a problem? The record indicates that Haw stated that shouldn't be a problem, but he never indicated that, yes, he would consent to the extension. And more importantly, we think the contracts between these parties and their course of dealing were very formal. They executed lawyer design agreements. All of the agreements contained the standard language that says any waiver or any amendment to this agreement must be in writing and signed by both parties. And the agreements also contained clear remedy sections for a breach. Now, under this agreement, Mr. Overstreet was required to do several things. First was he had to tender a deed free of any encumbrance that he or his company would have put on the property into escrow and close by the 30th. And he stated again in a letter dated May 22nd that this was an absolute deadline and Fairview Village was expected to comply. He didn't discover that he had a major problem with being able to meet that requirement until literally the day before closing. And the reason he didn't discover that is because he didn't order a preliminary title report until June 21st, scarcely nine days before the scheduled event. So when it suddenly came to his attention that this error or this cloud on title was present, he first started with checking with his bank to see how that could be, that this $900,000 lien could be on a piece of property that he didn't think he had ever encumbered. And ultimately it was determined that it was indeed a previous bank reporting error, but nevertheless it was on the property. The problem for Mr. Overstreet was he couldn't get to the individual who had the power to release that interest until after the 4th of July holiday, well after the scheduled closing date. Is it true your guys couldn't close on that day either if they wanted to because of other clouds on titles? Your Honor, there's substantial material in the record on that. My parties believe they could have closed on that day. But there's evidence from which I guess you could conclude otherwise and the judge concluded otherwise. That's correct. Interestingly though, the judge also concluded that had Mr. Overstreet not relied on the supposed statements of Messerly and or Haugh, he might well have, and I think that's the court's actual words, might well have been able to clear it, the title. And so that falls into this finding by the judge that there was some reliance by Mr. Overstreet on these representations when in fact we don't believe there was any reliance by Mr. Overstreet in this because he called, and the record is clear on this, he checked with the escrow officer after he had determined on the 29th that he wasn't going to be able to remove this cloud on title and told the escrow officer, hey, we're going to have to delay closing until I can get this cleared up. It was only on the 30th that he actually spoke with Charlie Haugh and then took the position that gosh, in reliance on his conversation with Haugh, he took no further action to try to be ready to close on the 30th. Your Honors, I want to point out an important case that is not in our briefing because it came down after the briefs were submitted to this Court. And that has to do with this topic again of whether equitable powers of a court are in any way restricted by clear agreements. And the case that we came across was McPherson v. Banauer at 187 Oregon App 551-69 Pacific 3rd at 733. This is a 2003 case, and it was issued in May of 2003, and the petition for review was denied on August 26, 2003. So this is something that's occurred afterwards, but it does stand for the proposition we believe, and it is inopposite to the cases cited by the respondents, that a court does not have unfettered discretion when it's using its equitable powers to disregard the clear terms of a contract, particularly one which has clear times of the essence clause. In this particular case, it arose out of an estate matter, and it is distinguishable on its facts in that the will that created the contract, if you will, or the opportunity to purchase real estate, did not have a specific times of the essence clause. Nevertheless, the Court ruled in favor of the purchaser in this case, or if there was no express provision limiting that power. So in this particular instance, we believe that the Albrocken case that is cited for the proposition by the respondents, that a slight delay or a reasonable delay doesn't interfere with the award of a specific performance. We think that the McPherson case stands for the proposition that if there is a specific times of the essence clause, a court needs to respect that. I think that's the reason. If we're going to give you five minutes for rebuttal. We've gone over 10 already. All right. Your Honor, thank you. May it please the Court. I'm not familiar with the McPherson case that was just cited, and I wonder if the Court would indulge me if a chance to look at that and if there's any response. Well, we'll let you know if we need some comment on it. We'll, if we think it's important to the decision, we'll give you an opportunity to respond in writing. Thank you, Your Honor. Opposing counsel begin by implying there were other interests at stake here who might be harmed by this. I would suggest that that is an issue that is not raised below, not in the briefs, and the notion that there are some other interests that might be injured, other than the part is that before here is not supported by the record. Opposing counsel said that this was a wholly executory contract. The evidence in this case was that it was not. It was a means of securing a loan. Oregon cases have held for a very long time the power of a court in equity is plenary to look through whatever instruments there are to see what the real transaction was of the parties before that. It was clear that the evidence was clear that this was one in a series of the parties' dealings and that it represented money that was owed to plaintiffs. It was not wholly executory because my client was out millions of dollars, and it would represent a forfeiture for our client to not get the relief that the Court awarded. The trial judge found that it would be unjust and inequitable for plaintiffs to get specific rescission, as they saw it, and you will notice that that particular finding is not challenged by our opponents here today. And the notion that you should look strictly to this sales agreement in itself is incorrect because actually the whole group of documents, the restructuring agreement, incorporates that as part of it. So you could not look at that particular document by itself anyway. And, in fact, if you look at plaintiff's complaint, you will see that what they seek is the rescission of the entire restructuring agreement, not the particular subagreement that they say is wholly executory, the subagreement that you say they say you must look to and not look to any other. As far as the question of whether our client relied on the representation that was made to them, made to Mr. Overstreet, as I understand it, the notion for the basis of the opposing counsel's argument is that he had already counseled the closing for the next day. However, he was still pursuing it the next morning. He followed through. He checked with Mr. Howe, told him, as Your Honor said, there should be no problem. The evidence was clear that at least, and that he stopped doing anything there. He was already doing something that morning. He was calling. He was told that there should be no problem. The evidence was that in the way the parties understood each other, that meant there would not be a problem, and he stopped doing anything. It was enough reliance that he stopped at that point doing anything else to see about getting the agreement, the problem solved that day. All of the other arguments I've made are in my brief. Unless the Court has any other questions, I'll move. Roberts. Thank you, counsel.  Your Honors. Thank you. We contend that the particular series of agreements that is the subject of this lawsuit is very different than anything that the parties had contemplated or experienced prior to that time. In reality, what was going on with this restructuring and repurchase agreement was that Mr. Overstreet was taking his chips off the table. He no longer wanted to be the judge. He no longer wanted to be an equity investor in the Fairview Village entity. Instead, he wanted to become more of a secured lender, and notwithstanding the fact that a lot of his initial purchases were structured as 1031 exchanges, he took the position before this district court that what was really going on here was that he was a secured lender and seeking his 8% return, and if he didn't get that, he was damaged. So the Court needs to be cognizant that there is not an interrelationship between the agreements that are the subject of this lawsuit and the subject of this district court's judgment and what the parties had done before. The Court had specifically ruled that there was, because of the course of dealing, kind of a package waiver concept, and we pointed out in our briefing that we don't believe that the package waiver theory as espoused under the Walker case is applicable at all. This case, this particular contract, was extremely different, involved different properties from other investments that Mr. Overstreet had made, and so it's clearly distinguishable. The Spies case, which is referenced in our brief, provides additional support for the concept that the package waiver does not apply. Now, in terms of whether Mr. Overstreet is practically out millions, the reality is if the Court had granted the relief that the Fairview Village parties sought in this case, which was simply to rescind the agreement in front of it so that Fairview Village no longer had the obligation to repurchase, Mr. Overstreet and Amber Hill Properties remain the owner of a valuable piece of commercial property and are in position to make money off of that property with further development. The only thing that rescinding that agreement does is not force a particular time frame for Fairview Village to purchase. So contrary to how it was presented to the District Court, there was no grand windfall being made to Fairview Village out of this. Contrary to counsel's representations, we most certainly do challenge that there was unjust and inequitable result visited upon Mr. Overstreet for the reasons just stated, and next, that we engaged or that the principles of Fairview Village engaged in any kind of wrongdoing or conduct that could ever be construed as either unjust enrichment or unclean hands. And finally, again, what we're seeking here is a reversal of this District Court's order, basically taking away the order to specifically enforce the agreement and the equitable subordination as well as the award of attorneyship. Thank you. Thank you. Those cases, Fairview, will be submitted. Next case on the calendar is National Management Services v. Quest.
judges: Reinhardt, Silverman, Clifton